**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| JEREMY DANIEL, | CIVIL ACTION |
|---|---|
| v. | NO. 17-4873 |
| T-MOBILE USA, INC. | |

Baylson, J.                                                                                            May 10, 2019

<u>**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

In this case, this Court must determine whether genuine disputes of material fact prelude summary judgment on behalf of Defendant T-Mobile USA, Inc. ("T-Mobile" or "Defendant"). Plaintiff Jeremy Daniel, who is suffering from Hodgkin's Lymphoma, alleges that his termination from his position as Account Services Representative ("ASR") at T-Mobile amounts to discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u>, and the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951 <u>et seq.</u> For the reasons discussed below, summary judgment for Defendant is DENIED.

### I.   UNDISPUTED FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from both parties' Statements of Facts and briefs, and are not genuinely disputed.

#### A.  Plaintiff's Position

Plaintiff joined MetroPCS as a Lead Sales Associate in June 2008. (ECF 18, "Def.'s SOF" ¶ 6.)  In 2009, Plaintiff was promoted to the position of ASR in MetroPCS's Fort Washington, Pennsylvania office. (<u>Id.</u> ¶ 7.)  When the merger of MetroPCS and T-Mobile was finalized on May 1, 2013, Plaintiff maintained the same ASR position, but was employed by T-Mobile, which became the employer for all existing and future MetroPCS brand employees. (<u>Id.</u> ¶¶ 3, 5, 8).  At the time of his termination in July 2014, Plaintiff reported to Melissa Fail, an Account Manager.

1

(Id. ¶ 11.)[1]  As an Account Manager, Fail supervised two to four ASRs on average, including Plaintiff.  (Def.'s SOF Ex. D, "Fail Tr." at 11:21–13:24.)

An ASR is a "door level leadership role for the Indirect Distribution and National Retail Channels in a local market."  (Def.'s SOF Ex. C.)  As an ASR, Plaintiff was "responsible for the sales performance, training, communication local door marketing/merchandising and the execution of all sales and marketing strategies/tactics."  (Id.)  ASRs were also tasked with "creat[ing] and foster[ing] strong working relationships with door management, sales associates and dealer principals."  (Id.)  The "Essential Functions" of the position include the following:

- Creat[ing] weekly and monthly scheduled visits designed to drive overall door productivity and the markets [sic] indirect strategy. . . .
- Effectively communicat[ing], schedul[ing], and deliver[ing] sales training as required for indirect distribution doors.  Also attend[ing] internal team training and events.
- Maintain[ing] and document[ing] all store visit activity and review[ing] previous visits and initiatives for maximum productivity.

(Id.)  In other words, ASRs were required to "go out and train the employees and how to sell the product and services" and "maintain the store and make sure the store looks all right[.]"  (Fail Tr. at 11:3–10.)  In short, the ASR position entailed "marketing at the store level."  (Id.)

ASRs were expected to complete at least twenty store visits per week.  (Def.'s SOF Ex. B, "Daniel Tr." at 33:7–14.)  In 2012, Plaintiff was the assigned ASR for stores located in Pennsylvania, Delaware, and New Jersey, and he averaged between twenty-three and twenty-five visits per week.  (Id. at 34:9–11; Def.'s SOF ¶ 13.)  Plaintiff's typical workday began at 7:00 a.m., when he would see which stores he needed to visit, and he would plan to arrive at the store(s) around 9:00–10:00 a.m., when the stores opened.  (Daniel Tr. at 34:18–35:10.)  Plaintiff would

---

[1] The parties do not specify, and the record does not indicate, when Fail became Plaintiff's supervisor.  (See ECF 21, "Resp." Ex. D, "Fail Tr." at 12:23–13:5) (Fail did not "remember the exact year" when she began to supervise Plaintiff and was unable to provide a "rough estimation" of the year.)

return home between 6:30–7:00 p.m., and his workday would end between 8:00–8:30 p.m., after he logged his store visits and followed-up on any phone calls. (Id. at 35:11–17.)

## B. MetroPCS/T-Mobile's Leave Policies

MetroPCS's Short-Term Leave Policy dated January 16, 2012 provided that before an employee returned to work from short-term disability ("STD") leave, the employee was required to provide a Certification of Fitness to Return to Work to the Leave Management Vendor ("Return to Work Statement"), local Human Resources, and his manager. (Def.'s SOF Ex. F.) If this Return to Work Statement contained restrictions, the employee was required to contact his immediate manager and local Human Resources before returning to work to "review and assess the requested accommodations." (Id.) The same policy stated,

> If an employee does not return to work after six (6) months of STD leave or after a physician's release to return to work, whichever occurs first, the Company will conduct a review of the circumstances and a final determination of employee's employment status . . . will be made after discussing . . . and engaging in an interactive process to determine if a reasonable accommodation is available.

(Id.) Upon approval of Cigna, the Leave Management vendor, an employee could transition from STD to long-term disability ("LTD") leave, which provided additional income protection, but no additional job protection. (Id.)

This policy also included provisions concerning Family or Medical Leave Act ("FMLA") leave. FMLA leave act ran concurrently with STD leave. (Id.) Pursuant to this policy, eligible employees were entitled to twelve weeks of FMLA leave within a twelve-month period, either consecutively or on an intermittent or reduced schedule basis. (Id.)

MetroPCS employees were also subject to its disability policy, which was revised on August 1, 2011. (Def.'s SOF Ex. E.) This policy provided, with respect to reasonable accommodations, "Individuals with disabilities may request accommodations from their

3

supervisor, other management persons or Human Resources to enable them to apply for employment and/or to perform the essential functions of the position they desire or in which they are employed." (Id.) When an individual with a disability requested an accommodation, or MetroPCS "otherwise believe[d] that an accommodation may [have] enable[d] an individual with a disability to perform the essential functions of the job," MetroPCS would "engage in an interactive process with the individual to identify an appropriate reasonable accommodation." (Id.)

As of January 2014, after the May 2013 merger of MetroPCS and T-Mobile, Plaintiff was subject to T-Mobile's FMLA, STD, and LTD policies. (Def.'s SOF ¶¶ 5, 37.) T-Mobile's leave policies are "substantively identical" to MetroPCS's policies. (Id. ¶ 16 n.2.)

### C. Plaintiff's History of Requests for Medical Leave

#### a. First Continuous Leave of Absence ("LOA"): January 2, 2013–April 30, 2013

##### i. FMLA Leave: January 2, 2013–March 26, 2013

In December 2012, Plaintiff was diagnosed with Stage IV Hodgkin's Lymphoma. (Id. ¶ 25; Daniel Tr. at 38:9–39:3.) On December 20, 2012, Plaintiff applied for a continuous LOA from January 1, 2013 through May 31, 2013. (Def.'s SOF ¶ 26; id. Ex. I.) Plaintiff's request for FMLA qualifying leave was approved from January 2, 2013 through March 26, 2013, at which time he exhausted his FMLA leave. (Def.'s SOF ¶ 27; id. Ex. J.)

##### ii. STD Leave: March 27, 2013–April 30, 2013

On February 21, 2013, Plaintiff was granted a seven-week extension of his continuous LOA from March 27, 2013 through April 30, 2013, consistent with MetroPCS's STD policy. (Def.'s SOF ¶ 28.) Plaintiff received STD benefits payable through April 30, 2013. (Id. ¶ 30.) On May 1, 2013, Plaintiff returned to work with no restrictions. (Id. ¶ 29.)

### b. Second Continuous LOA: June 24, 2013–June 15, 2014

#### i. STD Leave: June 24, 2013–July 31, 2013

On June 26, 2013[2], approximately seven weeks after Plaintiff's return to work, his condition relapsed and he requested another continuous STD leave of absence from June 24, 2013 through July 31, 2013, which was granted. (Id. ¶ 31; id. Ex. L.)

#### ii. STD Leave: July 29, 2013–October 3, 2013

When Plaintiff's condition did not improve, on July 29, 2013, he requested another leave extension through October 3, 2013, which was granted. (Def.'s SOF ¶ 33; id. Exs. M, S.) During his leave, on September 12, 2013, Plaintiff underwent a stem cell transplant, which was unsuccessful. (Def.'s SOF ¶ 35; ECF 21-1, "P's SOF" ¶ 35.)

#### iii. STD Leave: September 23, 2013–November 4, 2013

After the unsuccessful procedure, on September 23, 2013, Plaintiff requested another leave extension through November 4, 2013, which was also granted. (Def.'s SOF ¶ 34; id. Ex. N; P's SOF ¶ 34.)

#### iv. STD Leave: November 4, 2013–December 22, 2013

On November 4, Plaintiff requested another extension of his continuous leave through December 22, 2013, which was granted. (Def.'s SOF Ex. S.) On November 21, 2013, Cigna informed Plaintiff that his STD benefits had been extended through December 22, 2013, his twenty-fifth week of STD benefits, at which time Plaintiff's STD benefits were exhausted. (Def.'s SOF ¶ 36; id. Ex. O.) At that time, Plaintiff's claim was transitioned for consideration of eligibility for LTD benefits. (Def.'s SOF ¶ 36; id. Ex. O.)

---

[2] Defendant's letter to the Equal Employment Opportunity Commission ("EEOC") in response to Plaintiff's EEOC charge states that, on June 13, 2013, Plaintiff requested a continuous LOA from June 24, 2013 to September 15, 2013. (Resp. Ex. S at 3.) The letter states that Defendant granted Plaintiff continuous leave from June 24, 2013 to July 31, 2013. (Id.) The exhibits cited in the letter are not included in the record.

### v. LTD Leave: December 20, 2013–April 30, 2014

Beginning on January 1, 2014, Plaintiff's leave of absence was transferred from MetroPCS to T-Mobile for administration. (Def.'s SOF ¶ 37; <u>id.</u> Ex. P.) Plaintiff requested, and Defendant approved, an extension of Plaintiff's leave from December 20, 2013 through April 30, 2014. (Def.'s SOF ¶ 39; <u>id.</u> Ex. Q.) Plaintiff was scheduled to return to work on May 1, 2014. (Def.'s SOF ¶ 39; <u>id.</u> Ex. Q.)

### vi. LTD Leave: April 8, 2014–May 1, 2014

On April 8, 2014, Plaintiff requested an accommodation of "extension of disability benefits," and indicated that he was "not sure" how long he thought he would need this accommodation. (Def.'s SOF ¶ 40; <u>id.</u> Ex. R.) In his request for accommodation, in response to the question asking how the accommodation would help Plaintiff perform the essential functions of his job, Plaintiff wrote, "N/A." (<u>id.</u> Ex. R.) The medical documentation accompanying the request indicated that Plaintiff would be unable to perform his job functions for "3-4 weeks for now," and that there was no other accommodation that would allow Plaintiff to perform his job functions. (<u>Id.</u>) Plaintiff's doctor did not specify which functions Plaintiff was unable to perform, but stated that if Plaintiff's scans and biopsy did not show recurring Hodgkin's Lymphoma, he would be able to return to work without restrictions on May 1, 2014. (Def.'s SOF ¶ 40; <u>id.</u> Ex. R.)

### vii. LTD Leave: April 29, 2014–June 15, 2014

Plaintiff submitted another request for the accommodation of "extended leave" for treatment of his relapsed Hodgkin's Lymphoma on April 29, 2014. (Def.'s SOF Ex. S.) Plaintiff indicated that he was "unsure" how long he would need this accommodation. (<u>Id.</u>) The accompanying medical documentation stated, in response to a question asking which job functions Plaintiff was unable to perform, "He may have adverse reactions to treatment (nausea, vomiting,

infection, etc.) that may prevent him from performing his duties." (Id.) Plaintiff's doctor indicated that Plaintiff would be unable to perform his job functions for "6-9 weeks," that there was no other accommodation that would enable Plaintiff to perform his job and identified June 15, 2014 as the recommended end date of the continuous leave period. (Def.'s SOF ¶ 41; id. Ex. S.) The medical documentation also stated that Plaintiff would need "indefinite treatment," and if he responded well to current therapy, "then he w[ould] need a bone marrow transplant if a donor c[ould] be found." (Def.'s SOF Ex. S.) Defendant approved Plaintiff's request for an extension of his leave of absence from December 20, 2013 through June 15, 2014, with a June 16, 2014 return-to-work date. (Def.'s SOF ¶ 42; id. Ex. T.)

### viii.   June 11, 2014–December 31, 2014 Leave Extension Request Denied

On June 11, 2014, Plaintiff requested an accommodation of "extension of leave" through the "beginning of September for now per doctor." (Def.'s SOF ¶ 44; id. Ex. V.) In response to the question asking how this accommodation would help him perform the essential functions of his job, Plaintiff wrote, "N/A." (Def.'s SOF Ex. V.) The medical documentation accompanying the request, which is dated June 27, 2014, indicates that Plaintiff "had an allergic reaction to treatment [and] fatigue, which may make it difficult for Plaintiff to perform his duties. (Def.'s SOF ¶ 47.) Plaintiff's physician noted that Plaintiff would be unable to perform all his duties" "through December 2014" and recommended continuous leave from "6/15/14-12/31/14." (Id.)[3] Plaintiff's doctor also noted that Plaintiff would need a bone marrow transplant, and that "a donor ha[d] not yet been found." (Id.) Because Plaintiff did not have an immediate relative who could

---

[3] The parties dispute whether the medical documentation indicated a return-to-work date. According to Defendant, Plaintiff's physician "did not identify an anticipated return-to-work date," but instead indicated that Plaintiff "would need at least six additional months of leave, through December 31, 2014." (Def.'s SOF ¶¶ 45–46.) Plaintiff, on the other hand, states that the medical documentation provided a "definitive leave ending date of '12/31/14.'" (P's SOF ¶ 45.)

serve as a donor, Plaintiff was placed on a transplant list.  (<u>Id.</u> ¶ 61.)  To date, Plaintiff has not received a transplant.  (<u>Id.</u> ¶ 62.)[4]  Joanna Makuannen (Benson), Defendant's Leave of Absence Manager responsible for Plaintiff's claim, did not contact Plaintiff or his physician regarding the return-to-work dates provided in Plaintiff's request for accommodation and the supporting documentation.  (ECF 21-1 at 10, "P's Add'l SOF" ¶ 8; ECF 24, "Resp. to Add'l SOF" ¶ 8.)[5]

### c.  Other Accommodations–Not Requested

Defendant previously allowed an ASR, who received a DUI and had his license revoked, to work from home for a "period of time."  (P's Add'l SOF ¶ 18; Resp. to Add'l SOF ¶ 18.)  Fail testified that she did not know how long that ASR was permitted to work remotely.  (Resp. to Add'l SOF ¶ 18.)  During Plaintiff's leaves of absence, Defendant did not ask Plaintiff whether Defendant could provide him with another accommodation that would have allowed hm to come back to work and fulfill the essential functions of his job.  (P's SOF ¶ 50.)

### d.  Coverage of Plaintiff's Duties

During Plaintiff's leaves of absence, other ASRs and Fail covered Plaintiff's work.  (P's Add'l SOF ¶ 1; Resp. to Add'l SOF ¶ 1.)  When Fail was asked whether she would have been able to cover Plaintiff's duties until September 2014, she testified, "I guess, yes."  (Fail Tr. at 31:7–32:12.)  When asked whether she could have covered Plaintiff's job duties until December 2014, Fail responded, "I emphasized with him so much.  I probably would have done what I could to get him back, but that's not the way it happened."  (<u>Id.</u> at 32:14–23.)  While Plaintiff was on leave, no

---

[4] Plaintiff denies this fact because Plaintiff's physicians "believe that he may no longer require a bone marrow transplant."  (P's SOF ¶ 62.)

[5] The parties dispute whether there was a discrepancy between Plaintiff's June 11, 2014 request for an extension of leave through "the beginning of September for now" and the medical documentation submitted in support of the request on June 27, 2014, which recommended a return-to-work date of December 31, 2014.  (<u>See</u> Resp. to Add'l SOF ¶ 8.)

one asked Fail whether she would be able to continue covering Plaintiff's work if he remained on leave until December 31, 2014.  (P's Add'l SOF ¶ 16; Resp. to Add'l SOF ¶ 16.)

### e. Defendant's Communications with Plaintiff During Leave

While Plaintiff was on leave from June 2013 through July 2014, Margaret Phan, T-Mobile's Employee Success Partner[6] testified that she communicated with Plaintiff "two to three times" regarding "issues or questions about his leave."  (Def.'s SOF Ex. X, "Phan Tr." at 30:19–23, 32:4–7.)  Phan testified that she called Plaintiff during this LOA to ask that he submit his paperwork to Cigna so that it could be reviewed and approved.  (Id. at 30:19–31:4.)  Phan's handwritten notes of a July 8, 2014 phone call with Plaintiff indicate that Plaintiff stated that Phan did not call him during his leave.  (ECF 21, "Resp." Ex. Q.)  In response, Phan reminded him that she spoke with him as needed and helped him "several times" with claims issues.  (Id.)  Makuannen has no recollection of speaking with Plaintiff directly regarding his leave.  (P's Add'l SOF ¶ 7; Resp. to Add'l SOF ¶ 7.)

## D. Plaintiff's Termination: July 3, 2014

Following Defendant's receipt of Plaintiff's June 11, 2014 request for accommodation, Phan met with T-Mobile's in-house counsel, David Johnson, and Makuannen (Benson) to discuss Plaintiff's request.  (Def.'s SOF ¶ 51; Phan Tr. at 40:23–41:18.)  Because of Plaintiff's "long history of extension requests and his ongoing need for continuous time away from work," Plaintiff's extension request was denied, and Phan, Makuannen, and Johnson decided to terminate Plaintiff effective July 3, 2014.  (Resp. Ex. S. at 4.)  Phan explained that they decided together that Plaintiff would not be able to return to work again "based on his history, . . . the continuous extension of leave, and knowing that at this point he still had a number of medical issues."  (Phan

---

[6] Plaintiff identifies Phan as "Director of Human Resources."  (P's Add'l SOF ¶ 5.)

Tr. at 61:18–62:6.)  Makuannen testified that she did not recall if she recommended Plaintiff's termination but noted that as part of her evaluation of whether to recommend next steps, she "would have been looking to see [the] number of leaves in the past, were they the same medical condition, how long holistically had he been away, whether it was FMLA or ADA, and if it was all for the same condition."  (Resp. Ex. P, "Makuannen Tr." at 40:2–14.)

Plaintiff was informed of his termination in a letter dated July 2, 2014 and signed by Phan. (Def.'s SOF Ex. Y.) [7]  The letter notified Plaintiff that his request to extend his continuous LOA, which began on June 24, 2013 was denied "after careful review" because "[t]he most recent documentation that we have received from your health care provider indicates that you are unable to return to work at this time."  (Id.)

On July 7, 2014 at 2:30 p.m., Plaintiff called Phan and left a voicemail.  (Resp. Ex. Q.) Phan returned Plaintiff's call on July 8 at 10:01 a.m.  (Id.)  During this call, Phan "explained TMUS policy to term after 1 yr.," [8] and discussed that Plaintiff had just asked for another leave extension to December 31, 2014, as Plaintiff was unable to return to work.  (Id.)  Phan reminded Plaintiff that he would still receive LTD benefits and reiterated that when he was able to return to work, he could reapply for a position with Defendant.  (Id.)  Plaintiff testified that he was not aware of any other T-Mobile employee who was permitted to take a leave of absence exceeding one year. (Def.'s SOF ¶ 58.)

---

[7] It is undisputed that Phan did not draft the letter, and Makuannen does not recall if she drafted the letter.  (See P's Add'l SOF ¶¶ 10–11; Resp. to Add'l SOF ¶¶ 10–11.)

[8] The parties dispute whether Defendant maintains a maximum leave policy.  Phan testified that the "policy to term after 1 yr." is not a written policy, but rather a practice to review an employee's status after one year of leave.  (ECF 23, "Rep." at 9) (citing Phan Tr. at 66:17–24.)

### E. Plaintiff's Post-Termination Benefits and Medical Treatment

Following his termination, on July 25, 2014, Plaintiff applied for Social Security Disability Income ("SSDI"). (Def.'s SOF ¶ 63; id. Ex. Z.) In September 2014, following a review of Plaintiff's application and supporting medical documentation, the Social Security Administration ("SSA") approved his claim for SSDI benefits. (Def.'s SOF ¶ 64; id. Exs. AA, BB.) To receive SSDI benefits, Plaintiff only had to provide the SSA with information and documentation regarding his diagnosis. (P's Add'l SOF ¶ 19; Resp. to Add'l SOF ¶ 19.) The SSA's "Disability Determination Explanation" notes that Plaintiff alleged an inability to function and/or work as of June 21, 2013. (Def.'s SOF Ex. AA.) Plaintiff first received SSDI benefits "around" September 28, 2014 for the period December 2013 through August 2014, and has continued to receive monthly SSDI benefits. (Def.'s SOF ¶¶ 65, 81.)

At no point has Plaintiff represented to the SSA that he is permanently disabled or unable to work due to his disability. (P's Add'l SOF ¶ 20; Resp. to Add'l SOF ¶ 20.) Since his termination from his position as ASR, Plaintiff has been employed by Unlimited Mobile, Uber, and Elite Mobile. (P's Add'l SOF ¶ 22; Resp. to Add'l SOF ¶ 22.)

## II. PROCEDURAL BACKGROUND

Plaintiff filed the Complaint on October 31, 2017 (ECF 1, "Compl."), alleging four Counts:

1. **Count I**: Discrimination and failure to accommodate under the ADA;

2. **Count II**: Retaliation in violation of the ADA;

3. **Count III**: Discrimination and failure to accommodate under the PHRA; and

4. **Count IV**: Retaliation in violation of the PHRA.

Defendant filed an Answer on December 14, 2017 (ECF 5). On September 13, 2018, Defendant filed a Motion for Summary Judgment on all Counts (ECF 17, "MSJ"). Plaintiff filed a Response

on October 18, 2018 (ECF 21), and Defendant filed a Reply on November 1, 2018 (ECF 23). Plaintiff moved for leave to file a Sur-Reply on November 5, 2018 (ECF 25), which the Court granted on November 8, 2018 (ECF 26). On November 15, 2018, Plaintiff filed a Sur-Reply (ECF 27, "Sur-Rep.").

The Court held oral argument on the Motion for Summary Judgment on April 30, 2019 (ECF 31, 32). During oral argument, the Court invited the parties to submit brief letters with precedential judicial decisions supporting their positions. Accordingly, on May 7, 2019, Defendant filed a letter in support of the Motion for Summary Judgment, and Plaintiff filed a letter in opposition (ECF 33).[9]

## III. LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue

---

[9] Plaintiff's letter does not appear on the docket.

at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## IV. DISCUSSION

### A. Parties' Contentions

#### i. Disability Discrimination (Counts I and III)

Defendant contends that Plaintiff's disability discrimination claims should be dismissed because, at the time of Plaintiff's termination, he was not a "qualified individual" under the ADA. (MSJ at 6–8.) Defendant contends that Plaintiff was not a "qualified individual" because he was unable to perform the essential functions of his job, which include conducting site visits and attending work, with or without reasonable accommodation. (Id.)

Specifically, Defendant argues that Plaintiff's request for an additional six-month extension of leave on June 27, 2014 was not a reasonable accommodation because Plaintiff was effectively requesting an indefinite leave of absence. (MSJ at 6–8; Rep. at 2–6.) Even though Plaintiff's physician provided a return-to-work date of December 31, 2014, Defendant avers that

because Plaintiff required a bone marrow transplant before returning to work, and a donor had not yet been found, it was not reasonably likely that Plaintiff would be able to return to work in December. (Rep. at 5.) Defendant also contends that because Plaintiff had requested seven prior extensions of leave, all of which had been granted, it was reasonable for Defendant to infer that this request for an eighth extension of leave would not be Plaintiff's last. (Id. at 6.) Moreover, Defendant avers that Plaintiff is judicially estopped from claiming that he was able to perform the essential functions of his job because he represented to the SSA that he was "totally disabled and unable to work." (MSJ at 8.)

Even if Plaintiff were able to establish a prima facie case of disability discrimination, Defendant argues, Plaintiff cannot establish pretext necessary to survive summary judgment. First, Defendant contends that Plaintiff cannot show that similarly situated employees outside of his protected class were treated more favorably because Plaintiff relies only on inadmissible hearsay to support his claim that another ASR, Joe Pasilusco, was permitted to work remotely. (Id. at 14–16.) Further, Pasilusco is not similarly situated to Plaintiff, Defendant argues, because he did not have the same supervisor as Plaintiff, nor were the individuals who decided to terminate Plaintiff involved in granting Pasilusco the alleged accommodations of working in the office and refraining from travel. (Id. at 15.) Second, Plaintiff cannot demonstrate that his termination was more likely than not motivated by an invidious discriminatory reason, Defendant argues. (Id. at 16.) Defendant seeks to undermine Plaintiff's anticipated argument that Defendant maintains a discriminatory no-fault leave policy under which employees are terminated after one year of leave by arguing that no such policy exists. (Id.)

Plaintiff, on the other hand, contends that he requested a finite period of leave because his physician indicated that Plaintiff would return to work on December 31, 2014. (Resp. at 13.) Such

a request, Plaintiff argues, was a reasonable accommodation. (Id.; Sur-Rep. at 3–6.) Plaintiff further contends that Defendant's policy of automatically terminating employees who have been on a continuous LOA for one year is discriminatory and impermissible, and that modifying this policy was a reasonable accommodation that Defendant unlawfully failed to consider. (Resp. at 19.) Plaintiff notes that the record reflects that Defendant did maintain such a policy, even if Defendant avers otherwise. (Id.)

Plaintiff then disputes Defendant's contention that Plaintiff's application for SSDI bars his disability discrimination claim. First, Plaintiff notes that relapsed/refractory Hodgkin's Lymphoma, from which Plaintiff suffers, is a medical disease codified as an automatic "disability" for SSA purposes. (Resp. at 15.) According to Plaintiff, a claimant whose disease is codified, like Plaintiff, may receive SSDI benefits, without making any representations about his ability to work. (Id.) Plaintiff further argues that even if Plaintiff's disability were not automatically covered by the SSA, Plaintiff is not estopped from bringing an ADA claim because he did not represent to the SSA that he was unable to work. (Id. at 16.)

Next, Plaintiff contends that even if Defendant had met is burden of providing a legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff can demonstrate pretext for various reasons. First, Plaintiff argues that Defendant has given shifting and inconsistent reasons for Plaintiff's termination. (Id. at 27.) Whereas Defendant explained to Plaintiff in July 2014 that he was terminated pursuant to Defendant's policy of terminating employees after one year of absence, after litigation, Defendant has disputed the existence of this policy and claimed that it terminated Plaintiff because he requested an indefinite leave of absence. (Id. at 28; Sur-Rep. at 9.) Second, Plaintiff argues that he has shown that Defendant treated Pasilusco, an ASR who was not disabled, more favorably when Brian Bromberg, who had some "involvement in [Plaintiff's] leaving,"

allowed Pasilusco to work from home after his driver's license was revoked. (Resp. at 29; Fail Tr. at 36:3–37:8.) Lastly, Plaintiff contends that Defendant lacks credibility because Defendant has provided contradictory evidence as to who was responsible for the decision to terminate Plaintiff. In particular, Plaintiff highlights that it is unclear who drafted Plaintiff's termination later even though it was signed by Phan. (Resp. at 32.)

### ii. Failure to Accommodate (Counts I and III)

Next, Defendant contends that Plaintiff's failure to accommodate claims should be dismissed because Defendant met its obligations to engage in an interactive process with Plaintiff. (MSJ at 10.) Defendant seeks to undermine Plaintiff's argument that Defendant should have contacted Plaintiff to ascertain whether he believed he could return to work in September or December 2014, and whether he believed that there were other accommodations that Defendant could offer him. (Id. at 11.) According to Defendant, Plaintiff's disagreement with his doctor's determination and his subjective belief that there were reasonable accommodations that would allow him to perform his job do not, without corroborating evidence, create a genuine dispute of material fact. (Id. at 12.) Further, Defendant argues that nothing in Plaintiff's multiple requests for leave, including his last request in June 2014, contained information sufficient to lead Defendant to inquire about any other accommodations other than extended leave. (Id. at 12–13.) Rather, Plaintiff's medical certifications were unambiguous that there was no other that would have enabled Plaintiff to perform the essential functions of his job. (Rep. at 8.)

In response, Plaintiff argues that Defendant failed to engage in an interactive process by refusing to discuss Plaintiff's "brief request" for an extension of medical leave in June 2014 directly with Plaintiff or his physician. (Resp. at 20.) Plaintiff contends that had Defendant followed its own practices to determine whether an extension of leave was feasible, Defendant

would have consulted with Fail, Plaintiff's supervisor, and realized that she could have covered Plaintiff's work.  (Id. at 22.)  Nor did Defendant fulfill its obligation to inquire whether it could provide Plaintiff with another accommodation that would have allowed him to fulfill the essential functions of his job, such as allowing Plaintiff to work in the office temporarily and refrain from traveling.  (Id. at 23.)  Plaintiff also contends that Defendant has failed to establish that granting Plaintiff's requested reasonable accommodation of additional leave would have caused Defendant an undue burden.  (Id. at 25–26.)

### iii.  Retaliation Claims (Counts II and IV)

Defendant concedes that Plaintiff can establish the first two elements of a prima facie case of retaliation under the ADA–that Plaintiff engaged in a protected activity and that Plaintiff was subject to an adverse employment action when he was terminated.  (MSJ at 18.)  However, Defendant contends that Plaintiff's retaliation claims must be dismissed because Plaintiff cannot establish that his first request for a continuous LOA in December 2012 or his second request for continuous leave in June 2013 was the but-for cause of his July 2014 termination.  (Id. at 18–19.)

Plaintiff, on the other hand, contends that Plaintiff has demonstrated causation because the temporal proximity between both of Plaintiff's June 2014 requests for leave and Plaintiff's July 3, 2014 termination is unduly suggestive. (Resp. at 35.)

### B. Analysis

#### i. Disability Discrimination: Disparate Treatment Claims (Counts I and III)–Summary Judgment is Denied.

Counts I and III allege disability discrimination based on a disparate treatment theory under different statutory frameworks.  Count I alleges discrimination under the ADA, and Count III alleges discrimination under the PHRA.  As noted above, Plaintiff argues that Defendant

discriminated against him by failing to accommodate his disability, specifically by denying his June 2014 request for an extension of leave through December 2014.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis on disability in regard to . . . the hiring, advancement, or discharge of employees[.]" 42 U.S.C. § 12112(a). Similarly, the PHRA makes it unlawful, in relevant part, "[f]or any employer because of the . . . non-job related handicap or disability . . . of any individual or independent contractor, . . . to discharge from employment such individual or independent contractor, . . . if the individual or independent contractor is best able and most competent to perform the services required." 43 P.S. § 955(a).

Both of Plaintiff's disability discrimination claims are subject to the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and can be analyzed together. Oden v. SEPTA, 671 F. App'x 859, 862 n.4 (3d Cir. 2016) (quoting Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012) (explaining that in the Third Circuit, "ADA and PHRA claims . . . are 'to be interpreted consistently' and 'have the same standard for determination of liability'")).

Under this framework, Plaintiff must first establish a prima facie case of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802. To make out a prima facie case of disability discrimination, a plaintiff must demonstrate: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an . . . adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., Inc., 134 F. 3d 576, 580 (3d Cir. 1998). To establish a prima facie case at the summary judgment stage, "'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements[.]'" Burton v. Teleflex

Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001)).

Second, if the employee is successful in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action at issue. McDonnell Douglas, 411 U.S. at 802–03. Third, if the employer successfully puts forth such a reason, the burden shifts back to the employee to prove that the employer's explanation is merely a pretext for the employment discrimination. Id. at 804–05; Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644–45 (3d Cir. 2015). Even though "the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)); see also Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (citations and internal quotation marks omitted) ("Throughout this burden-shifting exercise, the burden of persuasion . . . remains on the employee.").

The PHRA and the ADA "are interpreted identically, except where there is something specifically different in the PHRA's language requiring that it be treated differently." Wilson v. Iron Tiger Logistics, Inc., 628 F. App'x 832, 835 (3d Cir. 2015) (citing Fasold v. Justice, 409 F.3d 178, 184 n.8 (3d Cir. 2005)). As there is nothing in the language of the PHRA that warrants different treatment in this case, the Court will address both claims together.

### 1. Prima Facie Case–"Qualified Individual"

The parties do not dispute the first or third elements of a prima facie case–that Plaintiff's cancer was a disability and that Plaintiff suffered an adverse employment action when he was terminated. At issue is whether Plaintiff has produced sufficient evidence to create a genuine

dispute of material fact as to the second element–whether Plaintiff was "qualified" to perform the essential functions of his job at the time of his termination.

A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The EEOC has divided this inquiry into two parts: "(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006) (citations omitted).

Here, there is no dispute that Plaintiff has the requisite qualifications and skills to perform the ASR position. Rather, Defendant asserts that attendance and traveling to retail stores are essential functions for ASRs, who are assigned dealer stores to assist them in properly executing all T-Mobile's merchandising, branding, and operating initiatives. (MSJ at 6.) The question before this Court is limited to the second inquiry: whether Plaintiff could have performed all the essential functions of his position with reasonable accommodation.

### a. Essential Functions

Under the ADA, a job duty is "essential" if it is a "fundamental," not "marginal," function of the position. Turner, 440 F.3d at 612. For example, a job function may be considered "essential" "because the reason the position exists is to perform that function." Id. (citation omitted). "[W]hether a particular function is essential is a factual determination that must be made on a case by case basis [based upon] all relevant evidence." Id. (citation and internal quotation marks omitted). Evidence of whether a particular function is essential includes "[t]he employer's judgment as to which functions are essential," "[w]ritten job descriptions prepared before

advertising or interviewing applicants for the job[,]" "[t]he amount of time spent on the job performing the function[,]" "[t]he work experience of past incumbents in the job[,]" and/or "[t]he current work experience of incumbents in similar jobs." Id. (citation omitted).

The parties do not dispute that attending work[10] and conducting site visits were essential functions of the ASR position. Defendant views conducting weekly site visits as "essential" and submits a job description in support. The job description lists "weekly and monthly scheduled visits" and "maintain[ing] and document[ing] all store visit activity and review[ing] previous visits and initiatives for maximum productivity" as two of the six "Essential Functions" of the position. (Def.'s SOF Ex. C.) Plaintiff testified that he agreed that this description accurately summarized the essential functions of the ASR position, and noted that these "Essential Functions" depicted the "baseline requirement" of an ASR's duties. (Daniel Tr. at 27:1–22.)

Though Defendant's judgment, the job description, and Plaintiff's testimony suggest that conducting site visits is an essential function of the ASR position, the record as a whole reflects a triable issue. Plaintiff analogizes this case to Aspen v. Wilhelmsen Ships Service, No. 13-6057, 2015 WL 1020660 (E.D. Pa. Mar. 9, 2015) (Robreno, J.). In Aspen, Judge Robreno concluded that traveling to and boarding vessels were not essential functions of the plaintiff's position as a ship's agent, as the defendant, the plaintiff's former employer, limited the plaintiff's access to vessels for six or seven months when his license was suspended, and the record reflected that the plaintiff's essential functions remained the same. Id. at *7–8. As a result, the court denied the defendant's motion for summary judgment on the plaintiff's ADA discrimination claim,

---

[10] Though the parties do not disagree that attending work is an essential function of the ASR position, judges in this District have explained that "where a leave from work is at issue, whether attendance is an essential function of a particular job is 'not the relevant inquiry.'" Shannon v. City of Phila., No. CIV.A. 98-5277, 1999 WL 1065210, at *5 (E.D. Pa. Nov. 23, 1999) (Bechtle, J.) (citation omitted). Therefore, the Court considers only whether the record reflects that conducting site visits was an essential function of the ASR position in ruling on the instant Motion.

concluding that the plaintiff showed that he could have performed all the essential functions of his position with a reasonable accommodation.  Id. at *8.

Just as in Aspen, the fact that Defendant allowed another ASR to work in an office and refrain from traveling for a "period of time" when his license was revoked is particularly important. Similar to Aspen, where the court concluded that the defendant could have offered the plaintiff similar accommodations as when his licensed was suspended, in this case, Defendant could have allowed Plaintiff to refrain from traveling for a period of time, just as Defendant did with Pasilusco, the ASR whose license was revoked.  Though Plaintiff did not request the accommodation of working from home, neither did the plaintiff in Aspen.  In fact, in Aspen, the plaintiff did not request any accommodations for his injury during his employment, but Judge Robreno concluded that this fact did not warrant dismissal of the plaintiff's ADA claims.  See id. at *2, *6.

Here, as Plaintiff testified, if he had been given the option to work from an office, just as Defendant gave the ASR whose license was revoked, he would have been able to perform his duties.  (Daniel Tr. at 177:1–178:5.)[11]  Defendant disputes that allowing Plaintiff to work in an office and refrain from traveling were reasonable accommodations, as Defendant argues that these modifications "would have necessarily removed essential job functions from [Plaintiff's] responsibility."  (Rep. at 8.)  However, given that the record reflects that Pasilusco maintained an ASR position without traveling, whether conducting daily or weekly site visits is an "essential function" of the ASR position is a factual issue for trial.  See Turner, 440 F.3d at 613 (noting that the Third Circuit has issued a "directive to the district courts that these issues [of whether a job

---

[11] Plaintiff also testified that, in retrospect, "knowing what I know now [about the termination in] July, probably I would have made it to work [with no restrictions] . . . [in] August, the latest September, especially if I knew my job was at stake, definitely." (Daniel Tr. at 169:3–18.)  The Court notes that "'[w]hat is relevant [to an ADA discrimination claim] is whether Plaintiff was a qualified individual within the meaning of the ADA at the time of his termination.'"  Aspen, 2015 WL 1020660, at *6 (quoting Jacoby v. Bethlehem Suburban Motor Sales, 820 F. Supp. 2d 609, 621–22 (E.D. Pa. 2011) (Robreno, J.)).

function are essential] are for the jury to decide" and has "cautioned against any premature determination of what is an essential function"). Plaintiff has presented sufficient evidence for a reasonable jury to find that conducting daily or weekly site visits is not an essential function of the ASR position.

### b. Reasonable Accommodation

Defendant also argues that Plaintiff has failed to show that he was a "qualified individual" because there is no evidence that Plaintiff requested a reasonable accommodation. In particular, Defendant argues that it reasonably construed Plaintiff's June 2014 request for a six-month extension of leave as a request for indefinite leave, which was not a reasonable accommodation, because the medical certification accompanying the request "was unambiguous that [Plaintiff's] ability to return to work was speculative at best." (Rep. at 5–6.)

In the Third Circuit, "the plaintiff bears the initial burden of proving that he is qualified and, 'if an accommodation is needed, the plaintiff must show, as part of [his] burden of persuasion, that an effective accommodation exists that would render [him] otherwise qualified.'" Gardner v. Sch. Dist. of Phila., 636 F. App'x 79, 83–84 (3d Cir. 2015) (quoting Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 670 (3d Cir. 1999)). Therefore, "[a] disabled employee establishes a prima facie case for relief under the ADA 'if [he] shows that [he] can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation.'" Gardner, 636 F. App'x at 84 (quoting Skerski v. Time Warner Cable Co., 257 F.3d 273, 284 (3d Cir. 2001)).

A leave of absence may, in some circumstances, be a reasonable accommodation if the leave "would enable to the employee to perform his essential functions in the near future." Aspen, 2015 WL 1020660, at *5 (quoting Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151

(3d Cir. 2004)); see, e.g., Shannon, 1999 WL 1065210, at *6 (noting that "reasonable accommodation is a 'continuing' duty and is not exhausted by one effort" and denying summary judgment where a jury could reasonably believe the plaintiff's request for an additional three months of unpaid medical leave after a twelve-week FMLA leave was a reasonable accommodation).

However, as Plaintiff concedes, "'an indefinite and open-ended' leave of absence 'does not constitute a reasonable accommodation.'" Aspen, 2015 WL 1020660, at *5 (quoting Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x 581, 586 (3d Cir. 2004)); see also Shannon, 1999 WL 1065210, at *5 ("A leave for an 'indefinite' period of time . . . is not a reasonable accommodation, particularly where the employee presents no evidence of the expected duration of the impairment and no indication of a favorable prognosis.").

Defendant contends that Plaintiff's physician effectively requested an indefinite leave of absence on Plaintiff's behalf. However, the medical certification indicates that Plaintiff's return-to-work date was December 31, 2014. Though Plaintiff's physician also stated in the June 2014 request that Plaintiff would require a stem cell transplant before returning from leave, but that a donor had not yet been found, the Court cannot conclude, as a matter of law, that requested six-month extension of leave would have enabled Plaintiff to perform the essential functions of his job in the "near future." See Conoshenti, 364 F.3d at 151. The issue of whether Plaintiff's leave request was "indefinite" is "a quintessential jury question." Bernhard v. Brown & Brown of Lehigh Valley, Inc., 720 F. Supp. 2d 694, 702 (E.D. Pa. 2010) (Pratter, J.). Accordingly, the Court concludes, for purposes of summary judgment, that Plaintiff has raised sufficient factual disputes to establish a prima facie case.

### c. Judicial Estoppel

Defendant also argues that Plaintiff is estopped from arguing that he was "qualified" at any time after June 21, 2013 because he represented to the SSA that he was unable to "function and/or work" as of that date. (MSJ at 8; Def.'s SOF Ex. AA at 1.) The Court disagrees. The Court concludes that Plaintiff's representation to the SSA does not irreconcilably conflict with his position in this litigation, and so Plaintiff is not precluded from arguing that he was "qualified" when he was terminated on July 3, 2014.

The Supreme Court has held that because representations in support of an SSDI application do not account for the possibility of a "reasonable accommodation," such representations do not necessarily estop an applicant or recipient from claiming that he is capable of performing the essential functions of his job with reasonable accommodation under the ADA. Cleveland v. Police Mgmt. Sys. Corp., 526 U.S. 795, 797–98, 803 (1999). In applying Cleveland, this Court must look for "additional rationale to explain the plaintiff's apparent about-face concerning the extent of his injuries[,]" such as "detail regarding the facts of his . . . case, demonstrating how the differing statutory contexts make[] [his] statements under one scheme reconcilable with [his] claims under the other." Motley v. N.J. State Police, 196 F.3d 160, 165 (3d Cir. 1999).

In the instant case, Defendant contends that because Plaintiff has been receiving SSDI benefits since September 2014, he necessarily represented to the SSA that he had a disability rendering him unable to work. (MSJ at 9.) In response, Plaintiff argues that he never represented to the SSA that he was "totally disabled and unable to work," and points out that while receiving SSDI benefits, Plaintiff has held several jobs. (Resp. at 15–16.)

The Third Circuit has drawn a comparison between plaintiffs who make "a mere blanket statement of complete disability checked on a box in order to obtain pension benefits" and those

who support their claims with "additional statements concerning the type and extent of [their] injuries." Motley, 196 F.3d at 167. "It is a plaintiff in the latter group that is likely to face estoppel when he asserts in an ADA case that he was in fact qualified to perform his job duties." McGlone v. Phila. Gas Works, No. 15-3262, 2017 WL 659926, at *7 (E.D. Pa. Jan. 19, 2017) (Baylson, J.); see also Bisker v. GGS Info. Servs., Inc., 342 F. App'x 791, 795 (3d Cir. 2009) (holding that the plaintiff was not estopped from arguing that she was qualified under the ADA despite her application for SSDI benefits because "[t]he proper focus of the judicial estoppel analysis is not on [the plaintiff's] general contention that she is unable to work, but rather on the specific factual representations she made in support of that contention").

Plaintiff falls into the former group. Plaintiff's SSDI application does not appear in the record, and the only representation that Plaintiff appears to have made to the SSA, as reflected in Plaintiff's "Disability Determination Explanation," was that he was unable "to function and/or work" as of June 21, 2013. (Def.'s SOF Ex. AA.) This same document indicates that Plaintiff's lymphoma qualified as a "medically determinable impairment." (Id.)

Plaintiff's representation to the SSA that he was unable "to function and/or work" as of June 21, 2013 "must be read as lacking the qualifier of reasonable accommodation, which did not apply for purposes of [his] SSDI application, but does for purposes of [his] ADA claim." Turner, 440 F.3d at 610. Plaintiff's "Disability Determination Explanation" effectively reflects Plaintiff's statement that he was unable to work "without reasonable accommodation." See id. This representation does not irreconcilably conflict with his ADA claim, in which Plaintiff claims that he was able to perform the essential functions of his job with reasonable accommodation. See id. Indeed, it is not implausible that Plaintiff felt that his cancer rendered him incapable of performing the essential functions of his job without an accommodation, but that he felt that he could have

done so with an accommodation.  See McGlone, 2017 WL 659926, at *7.  Therefore, the Court concludes that Plaintiff's ADA claim is not estopped by any representations made to the SSA or the fact that he receives SSDI benefits.

### 2.  Legitimate, Nondiscriminatory Reason

As set forth above, if an employee establishes a prima facie case, "the burden of production (i.e., of going forward) shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision."  Smith, 589 F.3d at 691.  The Third Circuit has held that this burden is "'relatively light'" and may be satisfied "'if the employer provides evidence which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason.'"  Evanoski v. United Parcel Serv., Inc., 571 F. App'x 92, 95 (3d Cir. 2014) (quoting Burton, 707 F.3d at 426).

Here, Defendant has failed to meet its "relatively light" burden.  Defendant contends that Plaintiff was terminated because, after conducting an individualized assessment of Plaintiff's final leave request, it determined that it could not grant Plaintiff indefinite leave with no guarantee end date.  (MSJ at 2; see also Resp. Ex. S at 4) ("Because of [Plaintiff's] long history of extension request and his ongoing need for continuous time away from work, [Plaintiff's] [June 2014 request for a six-month extension] was denied, and his employment was separated on July 3, 2014.").) This reason is not undisputed.  Cf. Walton, 168 F.3d at 668 (holding that the defendant articulated a legitimate, nondiscriminatory reason for the plaintiff's termination when the defendant claimed that the plaintiff's failure to provide the program she directed with necessary leadership and her extensive absences led the defendant to fear for the program's future).

The record reflects that Phan conveyed to Plaintiff during their July 8, 2014 phone call that he was terminated pursuant to Defendant's policy of terminating employees after one-year of

continuous leave. (Resp. Exs. Q, R.) Defendant disputes the existence of an automatic termination policy. In support of this contention, Defendant emphasizes that Phan clarified in her testimony that this was not a written policy, but rather "a practice that [Defendant] would review someone's leave status" after one-year of leave. (Phan Tr. at 66:17–24.) Neither reason, if true, would permit the conclusion that Defendant, as a matter of law, terminated Plaintiff for a non-discriminatory reason. Whether Defendant maintained a policy of terminating employees after one-year of continuous leave or terminated Plaintiff because he requested an extension of his continuous leave, the record reflects that Defendant terminated Plaintiff because he was on leave for his disability.

### 3. Pretext

Even if Defendant had proffered a legitimate, non-discriminatory reason for Plaintiff's termination, summary judgment would still be inappropriate on Plaintiff's disability discrimination claims. Turning to the third step of the McDonnell Douglas framework, once a defendant has satisfied its burden to establish a legitimate, non-discriminatory reason for the adverse employment action, "the burden of production shifts back to the plaintiff to proffer evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Worthington v. Chester Downs & Marina, LLC, No. 17-1360, 2018 WL 6737447, at *5 (E.D. Pa. Dec. 21, 2018) (Baylson, J.) (quoting Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999)).

"[T]he evidence [a] plaintiff proffers [to establish pretext] must meet a heightened 'level of specificity' to survive summary judgment." Jackson v. Planco, 660 F. Supp. 2d 562, 577 (E.D. Pa. 2009) (Dalzell, J.), aff'd, 431 F. App'x 161 (3d Cir. 2011) (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)). To do so, a plaintiff must "demonstrat[e] such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff may raise an inference of discrimination with evidence that "similarly situated person" outside of the protected class were treated more favorably. <u>Jackson</u>, 660 F. Supp. 2d at 577. To raise such an inference of discrimination, a plaintiff must establish "something more than 'the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group.'" <u>Id.</u> at 578 (quoting <u>Simpson</u>, 142 F.3d at 646). Further, "[t]he similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." <u>Jackson</u>, 660 F. Supp. 2d at 578 (citation and internal quotation marks omitted).

To show that there is evidence of pretext, Plaintiff first contends that Defendant's reasons for terminating Plaintiff are inconsistent. (Resp. at 27.) As noted above, the record reflects that Defendant conveyed to Plaintiff at the time of his termination that he was subject to a policy of terminating employees after one year of leave, but Defendant contends that no such policy exists and that Plaintiff was terminated after an individualized review of Plaintiff's leave status. The parties' arguments on this matter reveal that issues of material fact are in dispute.

Plaintiff has also put forth evidence relating to a comparator–Pasilusco, a non-disabled ASR whose license was revoked after a DUI but was permitted to work from home and refrain from traveling. Defendant argues that Pasilusco is not a valid comparator.[12] In particular,

---

[12]     Defendant contends that Plaintiff's comparator evidence is based on inadmissible hearsay. (MSJ at 15.) Plaintiff argues that Plaintiff's testimony regarding Pasilusco is not inadmissible hearsay because it was corroborated by Fail's testimony. (Resp. at 30.)

As Plaintiff notes, although Plaintiff may not have had first-hand knowledge of Pasilusco's accommodations, Fail testified that she "kn[ew] for a fact" that Pasilusco was able to work from home. (Fail Tr. at 36:3–11.) The basis of Fail's knowledge was that Pasilusco told her that he was able to work remotely, and that she "kn[ew] that that happened," although she never saw any documentation to that effect and was not involved in the decision to allow him to refrain from traveling. (<u>Id.</u> at 36:9–17.)

Defendant contends that Pasilusco and Plaintiff did not have the same supervisor, and that the individuals who decided to terminate Plaintiff were not involved in the decision to allow Pasilusco to work remotely.  (MSJ at 15 n.1.)

However, the record reflects that Brian Bromberg, Fail's "boss," allowed Pasilusco to work from home and had some "involvement in [Plaintiff's] leaving."  (Fail Tr. at 36:3–37:8.)  Though Pasilusco and Plaintiff did not have the same supervisor, judges in this Circuit, including this Court, have concluded that a plaintiff's comparators may be "similarly situated" even if they do not share the same direct supervisor.  See, e.g., Donaldson v. SEPTA, No. 17-4475, 2019 WL 801965, at *10 (E.D. Pa. Feb. 21, 2019) (Baylson, J.) (concluding that comparators were similarly situated to the plaintiff even though they were not subject to discipline by the same supervisor or supervisors because the same three decisionmakers exerted influence over their discharges); Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346, 363–644 (W.D. Pa. 2010) (concluding that even though only four of the eighteen proposed comparators shared the plaintiff's immediate supervisor, the comparators were similarly situated because all of their cases were reviewed by the same labor relations managers, and the same human relations manager was involved in each determination of disciplinary action).[13]

---

Though Fail's testimony is hearsay, "[i]n this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."  Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000); see also Robinson v. Hartzell Propeller Inc., 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004) (DuBois, J.) (citations and internal quotation marks omitted) ("[T]he Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial.  For example, hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony[.]").  Because Pasilusco's name was provided in Fail's testimony, Pasilusco can be called to testify at trial.  Therefore, the Court may consider Fail's testimony in ruling on the Motion for Summary Judgment.

[13] Though Donaldson and Nguyen involved Title VII claims and considered comparator evidence at the prima facie stage, the Third Circuit has applied the same "similarly situated" analysis to ADA claims at the pretext stage.  See, e.g., Jackson, 421 F. App'x at 166 (quoting Simpson, 142 F.3d at 645) (stating that a plaintiff "may raise of inference of discrimination by demonstrating that 'similarly situated persons were treated differently'").

As the record reflects that Pasilusco was allowed to refrain from traveling for a "period of time," a reasonable jury could infer that Plaintiff and Pasilusco were "similarly situated" in that they held the same position, were both unable to engage in the "daily, extensive travel" that Defendant claims is essential to the ASR position, and the same supervisor was involved in their leave decisions. (See MSJ at 6.) Though there is no evidence that Pasilusco was permitted to work from home for six months–the amount of additional leave that Plaintiff requested in June 2014–the amount of time is not a "highly relevant aspect" to Plaintiff's "employment circumstance." Jackson, 660 F. Supp. 2d at 578 (internal quotation marks omitted). Taking the evidence in the light most favorable to Plaintiff, Plaintiff has demonstrated that a non-disabled ASR who was unable to travel for a "period of time" was allowed to work from home rather than face termination. Based on the evidence Plaintiff has put forth, a reasonable jury could conclude that Defendant acted with a discriminatory motive in terminating Plaintiff's employment. The Court will deny summary judgment on Plaintiff's disability discrimination claims based on disparate treatment.

### ii. Disability Discrimination: Failure to Accommodate Claims (Counts I and III)–Summary Judgment is Denied.

Plaintiff also alleges that Defendant is liable for failure to accommodate or engage in the interactive process under the ADA. In particular, Plaintiff alleges that Defendant's denial of his June 2014 request for an extension of leave through December 31, 2014 request, and Defendant's failure to engage with him in an "interactive process," amounted to discrimination in violation of the ADA and PHRA. (Compl. ¶¶ 25, 33.)

The ADA provides a remedy when an employer fails to make "reasonable accommodations[14] to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.").

To determine the appropriate reasonable accommodation for an employee's disability, "it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." Taylor, 184 F.3d at 311 (citation and internal quotation marks omitted); see also see also Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010) (citation omitted) ("The term '[r]easonable accommodation' further 'includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith . . . .'").

"Initiating such a process, however, requires that the employer first be put on notice of a disability and request for accommodation." Ruggiero v. Mount Nittany Med. Ctr., 736 F. App'x 35, 39 (3d Cir. 2018). An employee puts an employer on notice by "provid[ing] the employer with enough information that, under the circumstances, the employer can be fairly said to both know of both the disability and desire for accommodation." Taylor, 184 F.3d at 313. Such notice triggers an employer's duty to engage in an interactive process with the employee in good faith. See id. at 313. The interactive process "requires a great deal of communication between the employee and

---

[14] "Reasonable accommodations" are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

employer" because "employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities[.]" Id. at 312, 316 (citations and internal quotation marks omitted).

This process "does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." Id. at 317. As a result, an employer is not liable if "the employee's actions or omissions during the interactive process cause the process's failure." Colwell, 602 F.3d at 507. In particular, "an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." Taylor, 184 F.3d at 317. "All that the interactive process requires is that employers make a good-faith effort to seek accommodations." Id.

An employer can show its good faith in this process in a number of ways, such as by taking the following steps:

> [M]eet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome.

Id.

In light of these rules, to prevail on a failure to accommodate claim, a plaintiff must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been

reasonably accommodated."  Capps v. Modelez Global, LLC, 847 F.3d 144, 157 (3d Cir. 2017) (citation and internal quotation marks omitted).

Here, it is undisputed that Defendant knew that Plaintiff was disabled and that Defendant was on notice that Plaintiff requested an accommodation of a leave extension in June 2014. Defendant contends that it fulfilled its duty to engage in an interactive process with Plaintiff from December 2012, when Plaintiff first requested leave, through June 2014, when Plaintiff was scheduled to return to work.  (See MSJ at 12.)  However, Defendant argues that Plaintiff's final request for a leave extension did not provide Defendant with notice of the desire for any accommodation other than extended leave, which was not a reasonable accommodation.  (See id. at 11; Rep. at 7–8.)  In other words, Defendant contends that Plaintiff's final request for a leave extension did not trigger an interactive process because there was no feasible accommodation that would have made Plaintiff capable of performing the essential functions of his job.  (See MSJ at 12.)  Specifically, Defendant argues that it was reasonable to rely on Plaintiff's physician's determination in the medical documentation accompanying this request that there was no accommodation other than a six-month extension of leave that would enable Plaintiff to perform his job.  (Id.)

As an initial matter, because the Court has concluded that there are factual disputes central to whether Plaintiff was a "qualified individual" at the time of his termination, summary judgment must be denied.  See Penson v. Phila. Presbytery Homes, Inc., No. 17-1981, 2018 WL 4561614, at *5 (E.D. Pa. Sept. 21, 2018) (Baylson, J.) (quoting Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 325 (3d Cir. 2003) ("An employer commits unlawful disability discrimination under the ADA if [it] 'does not mak[e] reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability . . . .")).

Even if it were undisputed that Plaintiff was a "qualified individual," summary judgment would still be inappropriate on Plaintiff's failure to accommodate claims. The Third Circuit has rejected Defendant's argument that the fact that Plaintiff only specifically requested a six-month extension of leave, an unreasonable accommodation, is fatal to Plaintiff's claim. In Taylor, the Third Circuit reversed the District Court's grant of summary judgment in favor of the defendant employer on the plaintiff's claim that the defendant failed to provide her with reasonable accommodations for her mental illness in violation of the ADA and PHRA. The defendant argued that it did not have a duty to participate in an interactive process because the plaintiff only specifically requested to be transferred to another position, which the plaintiff later conceded was not feasible. 184 F.3d at 315. The court explained that "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Id. at 317. Based on Taylor, there is no genuine dispute that Plaintiff's June 11, 2014 request for an extension of leave put Defendant on notice of his need for an accommodation, triggering Defendant's duty to participate in the interactive process in good faith.[15]

However, there are disputed facts concerning Defendant's good faith participation in the interactive process and the existence of reasonable accommodations. Where, as in the instant case, an employee requests an accommodation, "the employer cannot merely dismiss that request out of hand as unreasonable." Bernhard, 720 F. Supp. 3d at 701. The record is devoid of evidence demonstrating that Defendant ever had discussions with Plaintiff about working from home or

---

[15] Defendant's letter in support of the Motion for Summary Judgment contends that Plaintiff's request for an extension of leave did not trigger an interactive process, citing Walton, 168 F.3d at 670. Walton, while still good law, preceded Taylor, the Third Circuit's seminal decision on interactive process. See Gardner, 636 F. App'x at 84 (quoting Taylor, 184 F.3d at 312) ("[A]n employee does not act unilaterally in suggesting a reasonable accommodation. On the contrary, '[a]n employee's request for a reasonable accommodation requires a great deal of communication between the employee and employer,' and '[b]oth parties bear reasonability for determining what accommodation is necessary.'").

temporarily refraining from traveling. Rather, Phan testified that she communicated with Plaintiff "two to three times" from June 2013 through July 2014 regarding "issues or questions about his leave." (Phan Tr. at 30:19–23, 32:4–7.) The record does not reflect the dates of those conversations or their content. Further, Makuannen testified that she had no recollection of speaking with Plaintiff regarding his leave. (P's Add'l SOF ¶ 7; Resp. to Add'l SOF ¶ 7.) However, as discussed above, the record reflects that Plaintiff could have been reasonably accommodated, as Plaintiff has presented evidence that Pasilusco was permitted to work remotely and refrain from traveling when his license was revoked.

Therefore, genuine issues of material fact exist as to whether Defendant made a good faith effort to accommodate Plaintiff's disability. See Ruggiero, 736 F. App'x at 40 (vacating dismissal of failure to accommodate claim where the plaintiff's requested accommodations were rejected without the defendant proposing an alternative). Summary judgment will be denied on Plaintiff's failure to accommodate claims. See Taylor, 184 F.3d at 318 ("[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.").

### iii. Retaliation Claims (Counts II and IV)–Summary Judgment is Denied.

Plaintiff also alleges that Defendant terminated Plaintiff in retaliation for taking medical leave under two different statutory frameworks; Count II alleges retaliation under the ADA, and Count IV alleges retaliation in violation of the PHRA. The ADA provides, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a) (2002). Plaintiff's ADA claims for discrimination and retaliation are subject to the same burden-shifting analysis. Gavurnik v. Home Properties, L.P., 712 F. App'x 170, 173 n.5 (3d Cir. 2017) (citing Capps, 847 F.3d at 156 n.12 (retaliation under the ADA); Walton, 168 F.3d at

667–68 (disparate treatment under the ADA)); <u>Williams v. Pa. Hosp. of Univ. of Pa. Health Sys.</u>, No. 17-2413, 2018 WL 4491337, at *12 (E.D. Pa. Sept. 18, 2018) (Baylson, J.) ("A claim alleging retaliation for protected ADA activity is subject to the same <u>McDonnell Douglas</u> burden shifting analysis as a discrimination claim[.]").

Accordingly, a plaintiff alleging retaliation must first establish a prima facie case by demonstrating: "'(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 187 (3d Cir. 2003) (quoting <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997)).  If a plaintiff establishes a prima facie case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." <u>Krouse</u>, 126 F.3d at 500.  If the employer satisfies its burden, "the plaintiff must then prove that 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'" <u>Shellenberger</u>, 318 F.3d at 187 (quoting <u>Krouse</u>, 126 F.3d at 501).

As an initial matter, Plaintiff's request for additional medical leave is a protected activity under the ADA.  <u>See</u> <u>Bernhard</u>, 720 F. Supp. 2d at 703 (citation omitted).  The parties also do not dispute that Plaintiff's termination was an adverse employment action.  Rather, the parties disagree over whether Plaintiff can demonstrate a causal connection between his request for medical leave and his termination.

Temporal proximity between the protected activity and the alleged retaliatory action may establish a causal link if it is "unusually suggestive of retaliatory motive." <u>Krouse</u>, 126 F.3d at 503; <u>see</u> <u>also</u> <u>Barley v. Fox Chase Cancer Ctr.</u>, 46 F. Supp. 3d 565, 583 (E.D. Pa. 2014) (Dalzell,

J.) (quoting <u>Escanio v. United Parcel Serv.</u>, 538 F. App'x 195, 200 (3d Cir. 2013) ("'[M]ere temporal proximity' . . . is insufficient, by itself, to demonstrate the required causal nexus and '[o]nly when the facts are unusually suggestive of retaliatory motive may temporal proximity alone support an inference of causation.'")). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007).[16]

Defendant contends that the temporal proximity between Plaintiff's second request for a continuous LOA in June 2013 and his termination in July 2014 is not unduly suggestive. (MSJ at 17–18.) Plaintiff, however, argues that the relevant protected activity is Plaintiff's request for a six-month extension of leave on June 27, 2014, which took place six days prior to Plaintiff's July 3, 2014 termination. (Resp. at 35.)

The Court agrees with Plaintiff that the protected activity at issue is Plaintiff's June 2014 request for an additional extension of leave. Though Plaintiff's accommodation request is dated June 11, 2014, that request was for leave through the beginning of September. (Resp. Ex. L.) The record reflects that it was the June 27, 2014 medical documentation in support of that request, and the six-month extension of leave therein, that led to Plaintiff's termination. (<u>See</u> Resp. Ex. C) (explaining that Plaintiff's termination was effective July 3, 2014 because "[t]he most recent documentation that we have received from your health care provider indicates that you are unable to return to work at this time").) Defendant did not grant any of Plaintiff's prior requests for

---

[16] Though <u>LeBoon</u> involved a Title VII retaliation claim, the Third Circuit has stated, "[W]e analyze ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII." <u>Krouse</u>, 126 F.3d at 500.

extension of leave without reviewing the supporting documentation, suggesting that the June 11 request was not complete and reviewable until June 27. (See MSJ at 11.)

The Court concludes that the temporal proximity between Plaintiff's final request for an additional extension of leave and his termination could be unduly suggestive of retaliatory motive. Plaintiff was terminated six days after Plaintiff's physician submitted medical documentation requesting a six-month extension of leave on June 27, 2014. See Bernhard, 720 F. Supp. 2d at 703 (denying summary judgment on an ADA retaliation claim where the plaintiff was fired eight days after his request for additional leave). The evidence in the record indicates that the request for an additional extension of leave on June 27, 2014 led directly to Phan, Makuannen, and Johnson's discussions about Plaintiff's leave status, which, in turn, led to Defendant's decision to terminate Plaintiff effective July 3, 2014. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury to infer a causal connection between these two events. As noted above, there is sufficient evidence in the record for a reasonable jury to conclude that Defendant's reason for Plaintiff's termination was pretext for discrimination. Because the same analysis applies to Plaintiff's retaliation claims, the Court must deny summary judgment.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied.

An appropriate Order follows.

O:\CIVIL 17\17-4873 Daniel v TMobile\17cv4873 Memo re MSJ.docx